Case No. 19-16806

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRISTOPHER SLAIGHT,
AMIR MASOUDI, and NOBEL MANDILI,

Plaintiffs and Appellants,

v.

TATA CONSULTANCY SERVICES, LTD.

Defendant and Appellee.

On Appeal from the United States District Court
for the Northern District of California
No. 4:15-cv-01696-YGR / Hon. Yvonne Gonzalez Rogers

# APPELLEE'S ANSWERING BRIEF

**LOEB & LOEB LLP**
Michelle M. La Mar
Terrence D. Garnett
Erin M. Smith
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Tel: (310) 282-2133

**GREINES, MARTIN, STEIN & RICHLAND LLP**
Laurie J. Hepler
Geoffrey B. Kehlmann
50 California Street, Suite 1500
San Francisco, CA 94111
Tel: (415) 315-1774

Attorneys for Defendant and Appellee
**TATA CONSULTANCY SERVICES, LTD.**

# CORPORATE DISCLOSURE STATEMENT

Defendant and Appellee Tata Consultancy Services Limited is a publicly held corporation and is traded on the National Stock Exchange in India under the symbol "TCS" and on the Bombay Stock Exchange under the security code 532540.  Tata Sons Private Limited owns the majority of TCS's stock.  No publicly traded company owns 10% or more of Tata Sons Private Limited's stock.

**TABLE OF CONTENTS**

| | | | PAGE |
|---|---|---|---|
| CORPORATE DISCLOSURE STATEMENT | | | 2 |
| INTRODUCTION | | | 10 |
| JURISDICTIONAL STATEMENT | | | 12 |
| ISSUES PRESENTED | | | 13 |
| STATEMENT OF THE CASE | | | 14 |
| I. | THE PARTIES AND THE CLAIMS. | | 14 |
| | A. | TCS Is An Information Technology Consulting Company With A Diverse U.S. Workforce. | 14 |
| | B. | Plaintiffs Alleged That TCS Terminated Class Members Based On Their Race Or National Origin. | 19 |
| | C. | Trial Proceeded Under *Teamsters v. United States*, With Liability Tried First. | 20 |
| II. | CROSS-EXAMINATION HOBBLED PLAINTIFFS' STATISTICAL EVIDENCE, AND WITNESSES EXPLAINED WHY THE "LEADERSHIP DIRECTIVE" DID NOT REFLECT DISCRIMINATION. | | 23 |
| | A. | Plaintiffs' Statistical Case Failed. | 23 |
| | | 1. Plaintiffs' Expert's Opinions On Workforce Composition and Termination Rates. | 23 |
| | | 2. How Those Opinions Crumbled. | 25 |
| | B. | Plaintiffs' Characterization Of The "Leadership Directive" Fell Flat. | 30 |
| III. | TCS PRESENTED ABUNDANT EVIDENCE THAT IT DID NOT DISCRIMINATE. | | 32 |
| | A. | TCS Witnesses Described The Company's Vigorous Diversity Efforts and Non-Discrimination Mandate. | 32 |

**PAGE**

B.    Cross-Examination Of Plaintiffs' Witnesses Further Undercut Their Case.   36

IV.    THE JURY FOUND TCS DID NOT DISCRIMINATE.   39

A.    The Jury Never Questioned The Clear Claim-Based Instructions.   39

B.    The Defense Verdict And The Judge's Assessment.   40

SUMMARY OF THE ARGUMENT   42

ARGUMENT   46

I.    PLAINTIFFS DID NOT PRESERVE THEIR JURY INSTRUCTION ARGUMENTS, AND REGARDLESS, THE INSTRUCTIONS WERE NOT ERROR.   46

A.    Standards of Review.   46

B.    Plaintiffs Waived, Or At Least Forfeited, The Jury Instruction Arguments They Now Raise.   49

1.    Plaintiffs abandoned any request for the proof instructions to include the language they now say was required, and they approved the court's instruction "as written."   50

2.    Plaintiffs abandoned their argument for connecting citizenship discrimination to their race and national origin claims, and approved the court's instruction on citizenship.   59

3.    The pointless formality exception does not apply.   64

C.    The Instructions Were Not Error, Let Alone Plain Error.   67

1.    The instructions properly guided the jury's consideration of Plaintiffs' statistics to prove intent.   67

**TABLE OF CONTENTS**

**PAGE**

2. The verdict likely would have been the same with Plaintiffs' newly proposed changes. 73

3. The instruction on citizenship discrimination was not misleading, and the verdict would likely have been the same without it. 76

II. PLAINTIFFS FORFEITED THEIR EVIDENCE-EXCLUSION ARGUMENT, AND REGARDLESS, EXCLUDING HIRING EVIDENCE FROM A TRIAL ABOUT TERMINATIONS WAS NOT ABUSE OF DISCRETION. 79

A. The Rejection Of A Hiring Class. 79

B. The Court's Actual *In Limine* Ruling, And Plaintiffs' Failure To Offer Proof At Trial. 80

C. Standard of Review, If Any. 83

D. The Exclusion of Hiring Evidence Was Well Within The Court's Broad Discretion. 85

E. The Verdict Would Likely Have Been The Same Even If These Seven Email Strings Had Been Admitted. 87

CONCLUSION 90

CERTIFICATE OF COMPLIANCE 91

STATEMENT OF RELATED CASES 92

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Adkins v. Mireles*
526 F.3d 531 (9th Cir. 2008) 82

*Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*
941 F.3d 1195 (9th Cir. 2019) 70

*Boyd v. City and Cty. of San Francisco*
576 F.3d 938 (9th Cir. 2009) 88

*Branch Banking & Tr. Co. v. D.M.S.I., LLC*
871 F.3d 751 (9th Cir. 2017) 83

*Brown v. Nucor Corp.*
785 F.3d 895 (4th Cir. 2015) 72

*C.B. v. City of Sonora*
769 F.3d 1005 (9th Cir. 2014) 49

*Castaneda v. Partida*
430 U.S. 482 (1977) 73

*Chess v. Dovey*
790 F.3d 961 (9th Cir. 2015) 48, 65

*City of Long Beach v. Standard Oil Co. of Calif.*
46 F.3d 929 (9th Cir. 1995) 47

*Coral Const. Co. v. King Cty.*
941 F.2d 910 (9th Cir. 1991) 70

*Crowley v. Epicept Corp.*
883 F.3d 739 (9th Cir. 2018) *passim*

*Drinkard v. Johnson*
97 F.3d 751 (5th Cir. 1996) 71

*Engquist v. Oregon Dep't of Agric.*
    478 F.3d 985 (9th Cir. 2007)      83

*Espinoza v. Farah Mfg. Co.*, Inc.
    414 U.S. 86 (1973)      77

*Estate of Barabin v. AstenJohnson, Inc.*
    740 F.3d 457 (9th Cir. 2014)      87

*Frost v. BNSF Ry. Co.*
    914 F.3d 1189 (9th Cir. 2019)      47, 67

*General Elec. Co. v. Joiner*
    522 U.S. 136 (1997)      83

*Hazelwood School Dist. v. U.S.*
    433 U.S. 299 (1977)      53, 69

*Hemmings v. Tidyman's Inc.*
    285 F.3d 1174 (9th Cir. 2002)      49

*Hilao v. Estate of Marcos*
    103 F.3d 767 (9th Cir. 1996)      64

*Int'l. Brotherhood of Teamsters v. United States*
    431 U.S. 324 (1977)      *passim*

*Ludwig v. Astrue*
    681 F.3d 1047 (2012)      88

*McDonnell Douglas Corp. v. Green*
    411 U.S. 792 (1973)      20

*McEuin v. Crown Equip. Corp.*
    328 F.3d 1028 (9th Cir. 2003)      83

*Ollier v. Sweetwater Union High Sch. Dist.*
    768 F.3d 843 (9th Cir. 2014)      89

# TABLE OF AUTHORITIES

**PAGE**

*Shinseki v. Sanders*
556 U.S. 396 (2009) ........ 88

*Skidmore v. Led Zeppelin*
952 F.3d 1051 (9th Cir. 2020) ........ 48, 49, 63

*Sprint/United Mgmt. Co. v. Mendelsohn*
552 U.S. 379 (2008) ........ 86

*Swinton v. Potomac Corp.*
270 F.3d 794 (9th Cir. 2001) ........ 67

*U.S. v. Carpenter*
923 F.3d 1172 (9th Cir. 2019) ........ 88, 89

*United States v. Payne*
944 F.2d 1458 (9th Cir. 1991) ........ 65

*Wal-Mart Stores, Inc. v. Dukes*
564 U.S. 338 (2011) ........ 80, 85

## Statutes

28 U.S.C. § 2111 ........ 88

42 U.S.C. § 1981 ........ 19

42 U.S.C. § 2000e, et seq. ........ 19

Fed. R. Civ. P. § 23(b)(3) ........ 19

Fed. R. Civ. P. § 51(c) ........ 62

Fed. R. Civ. P. § 51(d)(2) ........ 48

Fed. R. Evid. § 103(a)(2) ........ 82

Fed. R. Evid. § 103(b) ........ 82

# TABLE OF AUTHORITIES

**PAGE**

Fed. R. Evid. § 403      83, 84, 86

**Rules**

Circuit Rule 28-2.5      64

**Other Authorities**

Federal Judicial Center, Biographical Directory of Article III
Federal Judges, 1789-present
https://www.fjc.gov/history/judges/ search/advanced-search
(last visited May 20, 2020)      10

Seventh Circuit Pattern Jury Instructions § 3.03 (2017)      50

## INTRODUCTION

Everyone knows statistics can mislead. They can omit key facts—for example: The great majority of U.S. Circuit Judges die while serving.[1] To non-lawyers without context, that could sound troublesome, as if judicial service carried serious danger. The proper context would include the fact that (with rare exception), federal judges' employment can't be terminated in the United States. It would also include other key facts: the option to take senior status and the preference of most judges not to leave work that they find rewarding. When supplied with context, non-lawyers can make sense of the assertion.

Statistics can mislead more powerfully when they omit key facts *and* highlight inapposite data. For example: "Tata [Consultancy Services] was ten times more likely to terminate non-Indians than Indians—10% compared to less than 1%." That assertion and others

---

[1] See Federal Judicial Center, Biographical Directory of Article III Federal Judges, 1789-present, https://www.fjc.gov/history/judges/ search/advanced-search (last visited May 20, 2020). Searching each Circuit by Termination Type readily confirms this. In the Ninth Circuit, 87% of all past judges served to the end of their lives.

are featured on page 1 of the Appellants' Opening Brief ("AOB"), and Plaintiffs relied heavily on those numbers at trial. At first blush, those statistics could sound troublesome—as if TCS, a company headquartered in India, were engaged in race or national origin discrimination. But here too, the proper context includes the fact that (with rare exception), Indian employees working here on visas cannot have their employment terminated in the United States. They must return to India upon completion of their assignments in the U.S., which prevents all such instances from appearing in the "1%" figure. The proper context includes other key facts too: TCS's U.S. workforce was mostly Indian expats because TCS had far more open positions than qualified workers available in the U.S. to fill them, and because workers rooted in the U.S. often *declined to relocate* for new project assignments—a key condition of employment.

This context, and much more testimony from TCS employees at every level as well as experts on both sides, enabled jurors to evaluate Plaintiffs' statistics. The district court itself observed that "cross-examination significantly undermined [Plaintiffs' expert's] credibility and his conclusions." 1-SER-5. And the testimony of many Plaintiffs

11

gave the jury reason to find them misleading, too.  The Opening Brief omits all these key facts, presenting only Plaintiffs' narrative.

The record overwhelmingly supports the unanimous verdict that TCS did not engage in race or national origin discrimination against non-Indians or non-South-Asians terminated from its U.S. workforce.

Plaintiffs now claim two instructional errors, both of which they waived (or at least, forfeited), and both of which are meritless in all events.  They also claim one evidentiary error, which they forfeited, and as to which they demonstrate no abuse of discretion or reversible error.  The judgment should be affirmed.

## JURISDICTIONAL STATEMENT

TCS concurs with Plaintiffs' statement.

# ISSUES PRESENTED

1.     Unless Plaintiffs waived the issue:  Whether the district court's "Claim-Based Instructions" (1-ER-15) require a new trial because—according to Plaintiffs—they "failed to inform the jury that intentional discrimination is inferred from a pattern or practice of discrimination proven by statistical evidence."

2.     Unless Plaintiffs waived the issue:  Whether the "Claim-Based Instructions" require a new trial because—according to Plaintiffs—they "conveyed to the jury that citizenship discrimination and race or national origin discrimination are mutually exclusive concepts."

3.     Unless Plaintiffs forfeited the issue:  Whether the court's actual ruling on TCS's Motion in Limine No. 9 was a prejudicial abuse of discretion.

## STATEMENT OF THE CASE

Plaintiffs have supplied only their own view of their own trial evidence. AOB 5-21. The evidence they omit told a far different story, and demonstrates why the jury found as it did.

## I. THE PARTIES AND THE CLAIMS.

### A. TCS Is An Information Technology Consulting Company With A Diverse U.S. Workforce.

Tata Consultancy Services Ltd. ("TCS") provides information technology services globally. 2-SER-91. It is headquartered in India. At the time of trial, about two-thirds of TCS's 420,000-person workforce was based in India, and about 36,000 in the United States. 3-SER-435.

TCS works on a "project" (contract) basis, providing services at customers' worksites across the United States, as well as from its own delivery centers. 2-SER-(91, 108, 83). Customer projects typically last from 6 to 24 months. 2-SER-299. As a professional services firm working on a project basis, employee mobility is essential to TCS. 2-SER-108.

14

TCS's U.S. employees fall into two categories: locals and expats.[2]

*Locals* are U.S. residents, hired here and legally permitted to work here. 2-SER-57. This group is composed of about 80 nationalities, and many races including South Asians. *See* 3-ER-518; 3-SER-363. Recently graduated or entry-level hires in the United States receive extensive paid training. 2-SER-(306:10–307:6, 308:17–310:25). All offer letters require a commitment to relocate for projects anywhere in the U.S.—though TCS does try to assign employees to suitable projects in their preferred locations. 3-SER-548; 2-SER-(107-110).

*Expats* are employees working in the U.S. on visas. 2-SER-(57, 95). Each is hired in his or her own country and works under a "deputation agreement" that forbids termination of employment in the United States (except in the most extraordinary circumstances, such as egregious malfeasance, imprisonment, or death). 3-SER-(362, 475-476); 2-SER-(325-327). Instead, absent a U.S. assignment, the

---

[2] TCS also subcontracts with some "Business Associates" for specific projects. They are not employees. 2-SER-(77, 92).

expat must return to his or her base branch of the company.  3-SER-447.

Expats comprised a majority of TCS's United States workforce in each year of the class period.  3-ER-503 (Plaintiffs' chart).  However, the same exhibit showed that this majority shrank each year, from 89% in 2011 to 69% in 2017.  *Id.*  Conversely, the share of TCS's United States workforce made up of locals grew from 11% in 2011 to 31% in 2017.  *Id.*  That share grew to about 40% by the time of trial in 2018.  2-SER-112.

***Project staffing and employee allocation.***  Each U.S. project has a business manager, who decides together with the customer how to staff the project.  The business manager enters staffing requests into a database (the Requirement Gathering System), including required skills and "good to have" skills, experience, location and start date.  2-SER-(67-68, 93, 128-129, 300-301).

Within TCS's Human Resources Department, the Resource Management Group (referred to as "RMG" in testimony) is responsible for identifying internal candidates and presenting them to the business manager for consideration, a process often called

"mapping." 2-SER-(68-70, 92-94, 99-100, 111, 295). If RMG exhausts its efforts without success, a request goes to the Talent Acquisition Group, which seeks external candidates to fill the vacancy. 2-SER-(69-72, 294-296).

Any time an employee is released from a project without immediately starting another, he or she is "unallocated"—also known as being "on the bench." 2-SER-(94,109); *see also* 2-SER-(312-313) (many causes for release from projects). The Resource Management Group works with benched employees to help reallocate them to appropriate projects. 2-SER-73. TCS also offers them additional training. 2-SER-(109-110). Employees update their skills and experience in TCS's system, and submit resumes. If the Resource Management Group finds a potential match for the employee's skills and location preferences, employees interview with business managers and/or customers, who ultimately decide which employees to place on the project. 2-SER-(74-75, 129); 3-SER-(336-337, 430-431, 480-481). If necessary, the Resource Management Group will look for matches outside the employee's preferred location. 2-SER-110; 3-SER-(332-333).

TCS pays benched employees full salary and benefits. But it can only do that for so long. 2-SER-(94, 316). If an employee remains unallocated beyond a reasonable time, TCS terminates his or her employment. *Id.*; 2-SER-94. Each proposed termination is evaluated individually based on all the circumstances. 3-SER-(332-333, 436-439, 449-450).

TCS maintained a database during the class period in which it could code only one reason for each employee's termination. 3-SER-(437-438). Often the reason for a termination was recorded as "unallocated," but the system did not specify *why* an employee became or remained unallocated. To determine that, one would need to examine each employee's termination form. 3-SER-(441-445, 473-474).

The reason was never a lack of projects awaiting staff, however. TCS had far more customer demand in the U.S. than it could fill. 3-SER-(445:21–446:13) (around 5000 vacant positions on any given day in 2017); 2-SER-324.

### B. Plaintiffs Alleged That TCS Terminated Class Members Based On Their Race Or National Origin.

Plaintiffs, all former employees of TCS, sued the company for race and national origin discrimination. Plaintiffs claimed disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1981. *See* 1-SER-1; 4-ER-(682-714) (operative complaint). There was no disparate impact claim. 1-SER-23, n.7. Thus Plaintiffs acknowledged that they "ha[d] to show intentional discrimination based on race or national origin." 2-SER-200; *see* §C below.

The district court certified a "termination" class under Federal Rule of Civil Procedure 23(b)(3), represented by Plaintiffs Slaight, Masoudi and Mandili. 1-SER-(1, 47). The class included:

> All individuals who are not of South Asian race or Indian national origin who were employed by [TCS] in the United States, were subject to a policy or practice of benching and allocation, were placed in an unallocated status and were terminated between April 14, 2011, and [December 27, 2017] and who are not bound by an arbitration agreement with TCS.

1-SER-(1-2).

### C. Trial Proceeded Under *Teamsters v. United States*, With Liability Tried First.

The Supreme Court created a framework for Title VII pattern-or-practice class action trials in the 1970s. *Int'l. Brotherhood of Teamsters v. United States*, 431 U.S. 324, 357-360 (1977). The court drew from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) "the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Teamsters*, 431 U.S. at 358. "Proof of discriminatory motive is critical, although it can *in some situations* be inferred from the mere fact of differences in treatment." *Id.* at 335 n.15 (emphasis added). Not *all* situations—"*some.*"

This point carried through to the court's discussion of statistical evidence. In the class action context, the issue becomes "whether there was a pattern or practice of such disparate treatment and, if so, whether the differences were 'racially premised'." *Id.* at 335, quoting *McDonnell Douglas* at 805 n.18. This theory of discrimination asks whether the defendant regularly and purposefully treated one group more favorably than another based on race. *Id.* The plaintiffs must

"establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id*. at 336.

Statistics can be "competent in proving employment discrimination," and "statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination"—"absent explanation." *Id*. at 339 and n.20. But, the Supreme Court cautioned, statistics are "not irrefutable … and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Id*. at 340.

Under *Teamsters*, plaintiffs' initial burden is to "establish a prima facie case that such a [discriminatory] policy existed"—i.e. "that unlawful discrimination has been a regular procedure or policy followed by an employer." *Id*. at 360. The employer may rebut that showing "by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant." *Id*. Using whatever evidence is appropriate to the situation, the employer may also "provide a nondiscriminatory explanation for [any] apparently discriminatory

result." *Id.*, n.46.  Here, Plaintiffs never established a prima facie showing of pattern or practice, because their evidence suffered so many weaknesses and credibility problems.  Still, TCS provided nondiscriminatory explanations to correct the misleading impression created by Plaintiffs' statistical case.[3]

The questions placed before the jury were whether Plaintiffs proved that TCS "engaged in a pattern or practice of intentionally discriminating against" non-Indian or non-South Asian employees who were benched and then terminated.  1-ER-13.  Nine jurors heard the case in November 2018.  4-ER-533, 553.  The court defined the Plaintiff class for the jury and explained: "Plaintiffs assert that TCS engaged in a systematic company-wide pattern and practice of employment discrimination based upon race and national origin against that class of individuals."  2-SER-(52-53).

---

[3] *Teamsters* went on to hold that proof of intentional discrimination against a class will "support[] an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy"—with the employer bearing a shifted burden to demonstrate that any individual plaintiff's treatment occurred for lawful reasons.  431 U.S. at 361. This trial never got to that stage.

"The Court observed during trial that the jurors worked very hard throughout the trial to determine how to resolve the parties' factual disputes. They paid close attention to the exhibit screens and the witnesses; many took extensive notes; [and] jurors posed dozens of questions during trial." 1-SER-2 (order denying new trial) (citing 4-ER-(554-578), Jury Notes).

## II. CROSS-EXAMINATION HOBBLED PLAINTIFFS' STATISTICAL EVIDENCE, AND WITNESSES EXPLAINED WHY THE "LEADERSHIP DIRECTIVE" DID NOT REFLECT DISCRIMINATION.

### A. Plaintiffs' Statistical Case Failed.

Plaintiffs aimed to "shift the burden to TCS under the *Teamsters* framework" by relying on their expert's claim of "statistically significant disparities in TCS's workforce composition and termination rates between South Asian and non-South Asian employees." 1-SER-4. This effort failed.

#### 1. Plaintiffs' Expert's Opinions On Workforce Composition and Termination Rates.

Plaintiffs' labor economics expert Dr. Neumark first opined that TCS's majority-South Asian workforce "deviates in a remarkable way from the ethnic or racial composition of the workforce in the same

narrow industry in the same kinds of jobs in the U.S." He continued: "Whereas the U.S. workforce in [TCS]'s industry is around 20 percent or so South Asian, [TCS]'s is in the range of 75 percent." 2-SER-(54-55). Dr. Neumark never explained why the workforces of even *American-headquartered* information technology companies had far more South Asians than the U.S. population as a whole. Jurors could reasonably infer that American-headquartered companies in TCS's industry found more South Asians with the necessary skills—a harbinger of evidence to come.

Second, Dr. Neumark opined that "the extent to which non-South Asians are terminated involuntarily, i.e., fired, relative to South Asians is sort of extraordinarily different"—a situation he deemed "strongly consistent with discriminatory behavior." 2-SER-55. Noting that over the class period there were "a lot more terminations of locals from the bench … than of expats from the bench"—while at the same time, TCS's U.S. workforce had "more expats than locals"—he cited discrimination as the likely cause. 2-SER-58.

Plaintiffs' Opening Brief relies heavily on Dr. Neumark. *See* AOB 13-16 (extensively citing 2-ER-(48-54)). But, like their motion for a new trial, Plaintiffs' brief "does not account for, or acknowledge, the evidence presented at trial that undermined Dr. Neumark's testimony." 1-SER-4.

### 2. How Those Opinions Crumbled.

In the trial court's view, "[t]he cross-examination significantly undermined Dr. Neumark's credibility and his conclusions." 1-SER-5. The order denying a new trial specified four ways this happened, citing testimony—and TCS cites additional record support here.

**Bias Of Plaintiffs' Expert.** Dr. Neumark admitted that his opinions in this case were the third time—out of three cases in which he testified for the Plaintiffs' counsel (Kotchen & Low)—that he found statistics "consistent with discrimination." 1-SER-(4-5). The critical exchange was:

> Q. Have you ever testified in a case for Mr. Kotchen where you did not find statistics consistent with discrimination?
>
> A. Out of the – out of the three cases I've testified, I believe that's the right number, no.

2-SER-59. Jurors could have discounted Dr. Neumark's opinions on this basis alone. The court instructed the jury (without objection) that it could give either side's expert opinion testimony "as much weight as you think it deserves." 1-SER-16.

**Data Blindness Of Plaintiffs' Expert.** Dr. Neumark admitted that "he limited the data in his [termination] analysis to TCS employees who were merely coded as 'unallocated' in TCS's system and therefore [he] did not consider or account for why the employees whose data [he] analyzed had become 'unallocated.'" 1-SER-5 (citing 2-SER-(65:20–66:4)). The district court observed: "Reasonable jurors could easily infer that Dr. Neumark's statistical analysis chose to ignore defendant's primary explanations for the results[,] namely an employee's unwillingness to relocate and the lack of suitable qualifications." *Id.*

Indeed they could. TCS presented testimony that the coded reason for a termination might merely say "unallocated" where performance problems actually *caused* the employee to become or remain unallocated. 2-SER-(322-323). And refusal to move for a new project assignment, despite having signed TCS's offer letter

26

containing that commitment, was the single largest factor in the termination of "unallocated" employees. 2-SER-(107-109). This was especially so for locals—who by definition, have stronger U.S. roots than expats do. 2-SER-(297-298), 3-SER-(368-369). It was so for many testifying Plaintiffs. *See* §III-B below.

But Dr. Neumark did not review any such information for any terminated employee. 2-SER-(60-66). He said he "didn't know of its existence." 2-SER-62.

**Weak Analysis By Plaintiffs' Expert.** The district court observed that "several of TCS's witnesses testified that Dr. Neumark's U.S. terminat[ion] rate analysis and the resulting disparities between 'local attrition' and 'expat attrition' did not reflect an accurate comparison." 1-SER-5. "Specifically, they testified that there is almost no such thing as 'expat attrition' in TCS's U.S. workforce (except in the most extreme circumstances, such as imprisonment or death) because expats' deputation agreements [discussed at page 12 above] 'prevent them from being terminated in the U.S.'" *Id.*, citing 3-SER-(361-362), 2-SER-(325-327)).

TCS's Deputy Head of Human Resources for North America explained this point in detail—including why Plaintiffs' exhibits

purporting to show huge discrepancies in attrition rates were not a fair or realistic comparison. 3-SER-(446-447, 474:19–477:25, 482-484); *see also* 2-SER-(101-102). Plaintiffs tried to bypass this problem by summarily asking their expert how his probability calculations were affected by "including terminations outside of the United States," but the jury was not required to accept his conclusory answer that "[t]hey made virtually no difference." 2-SER-56. It was entitled to give more weight to TCS's labor economics expert, Dr. Edward Lazear. While not disputing the arithmetical accuracy of the numbers Dr. Neumark chose to study (AOB 16), Dr. Lazear *did* dispute Neumark's decision to include expats in his U.S. termination analysis. 3-SER-(422-426).

**More Sensible Approach Of TCS's Expert.** The district court recounted Dr. Lazear's alternative statistical approach. 1-SER-5. "Dr. Lazear compared TCS's actual rate of involuntary termination for non-South Asian locally-hired employees (like plaintiffs) of 7.3%, [] with the national average for a corresponding group of 25.8%." *Id.* (citing 3-SER-(417:20–418:8)). "Dr. Lazear opined that this data was inconsistent with a pattern of

discrimination because any company intending to discriminate against such employees should have a termination rate higher than the national figure, not one-third of the national figure." 1-SER-5 (citing 3-SER-419:8-24).

Unlike Plaintiffs' labor economist, Dr. Lazear supplied *economic* rationale for his labor statistics. He explained that it is quite expensive to train consultants, such as TCS employees, both in terms of actual costs and lack of revenue-production. "Once you have trained people, you have borne these costs, chances are you don't want to terminate them." 3-SER-(419-422).

TCS's practices bore out that incentive. TCS invested many weeks in training each entry-level employee. 2-SER-(306:10–307:6, 308:17–310:25). In addition, TCS continued full salary and benefits for all unallocated employees. 2-SER-316. And TCS only earned revenue by assigning employees to appropriate projects—so it strived to avoid *any* employee remaining unallocated. 2-SER-(76, 100); 3-SER-(366-367). Finally, as noted above, customer demand far outstripped TCS's available, qualified resources. So TCS had a strong

incentive to keep every employee busy, if his or her skillset and availability matched a customer need.

The district court summarized the impact of this evidence under the heading "Failures in Plaintiffs' Affirmative Case."  Their theory of discrimination, the court said, "relied on their contention that TCS intentionally displaced class members by assigning Indian or South Asian employees to jobs that class members were successfully filling or could have filled, resulting in class members' terminations from the bench.  But that theory ignored the undisputed evidence" tending to show that TCS "had no motive to discriminate," set forth above.  1-SER-8.

## B. Plaintiffs' Characterization Of The "Leadership Directive" Fell Flat.

The Opening Brief discusses a 2012 "leadership directive" created by senior TCS executives in North America—but again Plaintiffs recount only a slice of the evidence about it, divorced from any meaningful context.  AOB 8-9.  TCS leaders did email the company's business-unit heads to utilize every visa to the maximum extent, by keeping expats working at "onsite" (U.S.) projects.  2-SER-(96-98).  But the evidence showed the directive encompassed more

than that.  Executives testified that maximizing the use of each visa was only one aspect of a larger company strategy to fuel growth by retaining *all* the employees it could.  3-SER-(352-358); 2-SER-127.  This strategy included minimizing local attrition, and TCS worked hard and successfully to do so.  2-SER-(314-321); 3-SER-(360-361) (local attrition reduced to 18% by time of trial, and TCS aimed to push it lower).

Most importantly, as the district court noted, "TCS presented evidence that maximizing the value TCS obtained from each visa did not mean taking jobs from local U.S. workers."  1-SER-6 (citing 3-SER-(356-357)).  "Plaintiffs never explained how TCS would engage in a pattern of discrimination where TCS had more jobs to fill than qualified and willing employees to fill them."  *Id*. (citing 3-SER-(445:21–446:13)).  In other words, the evidence showed that TCS had absolutely no motive to discriminate against qualified employees of any race or national origin.  The district court therefore deemed reasonable the jury's apparent determination "that the leadership directive failed to establish, or support, a finding of discrimination."  *Id*.

## III. TCS PRESENTED ABUNDANT EVIDENCE THAT IT DID NOT DISCRIMINATE.

### A. TCS Witnesses Described The Company's Vigorous Diversity Efforts and Non-Discrimination Mandate.

Executives and managers from every level of TCS's Human Resources operation testified at trial. The district court summarized: "TCS witnesses, including executives and talent-engagement managers, testified that company policy and practice were to treat locals and expats equally, and internal job placement was driven by employees' skills and experience, as well as their availability for a new project (based on the expected end of a current role) and if practicable, employees' location preferences." 1-SER-7 (citing 3-SER-(358-359), 2-SER-(111, 295-296, 300:21–302:5) [explaining the few instances where a role may legitimately need an expat, such as projects heading offshore, or a local, such as U.S. defense contracting]); *see also* 3-SER-448; 2-SER-(78-82). Less than 1% of all TCS positions during the class period were designated "expat preferred"—and the same was true for locals. 2-SER-(129-130).

Terminations, too, were evaluated individually based on all the circumstances, without regard to race or national origin. The Deputy

32

Head of Human Resources for North America evaluated each proposed termination to ensure fairness to the employee. 3-SER-(332-333, 436-439, 449-450).

Indeed, TCS's Code of Conduct, which every employee must sign and abide by, forbids discrimination based on race, nationality or ancestry (among other grounds). 3-SER-529; 2-SER-(132-133, 303). TCS provides multiple avenues for employees to report suspected discrimination, and fully investigates any such report. Penalties for discrimination can include termination. 2-SER-(131-133, 311); 3-SER-(366, 427-429).

But the evidence went well beyond enforcing an anti-discrimination policy. TCS's Head of Workforce Effectiveness for North America testified in detail about the company's robust diversity and inclusion program, begun in 2011. It aims to maximize diversity in all forms across employees' whole "life cycle" with TCS. TCS has always committed senior management time to the council leading the program, and strived to innovate techniques to make the program more effective. 3-SER-(336-352).

TCS also explained how, even with these efforts, its U.S. workforce remained majority-Indian. TCS certainly never argued that this was "the result of happenstance" (AOB 15)—so Plaintiffs' expert opinion about the "1 in a billion" chance of that was a red herring. *See* AOB 1, 16, 40. Instead, TCS highlighted two major factors contributing to this disproportion—which Plaintiffs' expert never accounted for.

First, the U.S. education system produces fewer than half the computer science graduates that the information technology industry demands each year for entry-level jobs—causing talent shortfalls for TCS and similar organizations around the country. 2-SER-(84-85). By contrast, India—where TCS is headquartered—has many institutions that produce technical graduates. 3-SER-(433:21–434:5). TCS has invested significant effort and many millions of dollars to assist schools and universities in the U.S. to produce more technically-skilled graduates. 2-SER-(103-106); 3-SER-(364-365).

This evidence undercut Plaintiffs' case in several ways. It offered a key reason why, to meet U.S. customer demand, TCS needed to use its existing expat employees alongside its local employees. It

34

also supported a fair inference that many individual local hires did not have experience with the technological platforms required for open positions at client sites, and therefore could not be placed as readily.[4]  Finally, TCS's effort to grow the U.S. pipeline of qualified graduates countered Plaintiffs' contention that the company intended to discriminate in favor of Indians.

The second factor TCS presented to explain the high proportion of Indian expats in its workforce was mobility.  As already noted, the single largest reason local employees remained unallocated was their unwillingness to take project assignments outside their preferred area—despite having signed an offer letter spelling out that requirement.  *See* § II-A-2 above.  Indeed, several Plaintiffs admitted at trial that they turned down opportunities TCS offered them, in order to stay in their preferred regions.  *See*, *e.g.*, 2-SER-(288-289) (Kottke); 2-SER-(304:18-23, 305:2-21) (Goodwin); 3-SER-(370-371) (Jordan); and Slaight and Masoudi, discussed below.

---

[4]  For examples of class members illustrating this problem, *see* 3-SER-(478-479) (Slaight's inexperience); 3-SER-(334:25–335:3, 372-374) (Scott's limited skillset).

**B.    Cross-Examination Of Plaintiffs' Witnesses Further Undercut Their Case.**

Many Plaintiffs and class members testified, seeking to "bolster their statistics with evidence of individual instances of discrimination to bring 'the cold numbers convincingly to life.'" AOB 27 (quoting *Teamsters*, 431 U.S. at 339). They were far from convincing. As the district court found, "a jury could reasonably discount much of this testimony purporting to present evidence of actual discrimination with respect to allocation." 1-SER-6.

Cross-examination "revealed that many of the named plaintiffs [and other] class members had location or other concerns with respect to allocation." *Id.* The district court cited one vivid example: "plaintiff Massoudi argumentatively denying that he was removed from TCS's Apple account at Apple's request because he had been argumentative[,] and stating that TCS 'never offered [him] anything' immediately before conceding that TCS offered him a position in Walnut Creek, which he turned down due to the commute." *Id.* (citing 2-SER-(134-142)). TCS paid Massoudi full salary and benefits for five months on the bench before terminating him. 2-SER-142.

More credibility problems, unwillingness to relocate, and even anti-Indian prejudice surfaced during other Plaintiffs' testimony, and that of supporting witnesses. Counsel did not even attempt to rehabilitate some of them (as noted below), despite leaving part of Plaintiffs' allotted trial time unused. 3-SER-485.

- **Chad Cooper** admitted that he lied to TCS in 2014 about his need to continue active cancer treatment—apparently to deceive TCS into extending his paid time on unallocated status. 2-SER-161 ("So I'll just say this was a lie. This was an exaggeration."); 2-SER-(159:9–164:11) (as of the 2018 trial, he hadn't had a cancer treatment in over a decade). Cooper admitted making other false statements to TCS too. 2-SER-(148-150, 155). Despite all this, TCS arranged several more interviews for him, and paid him full salary and benefits while he was idle. 2-SER-(151-158).

- **Named Plaintiff Nobel Mandili** testified he had been willing to work "anywhere in the world" for TCS, but admitted that while on the bench, he turned down TCS's offer of a job in Minnesota because he preferred to return to

37

Microsoft (a job he then did not obtain). He collected full pay and benefits for nine months before TCS terminated him. For part of that time, he admitted, a vacation prevented the Resource Management Group from reaching him about potential projects. 2-SER-(173-177); 3-SER-(535-538). There was no re-direct examination. 2-SER-(178-179).

- **Named Plaintiff Christopher Slaight** worked at TCS for nine months right after college, three of which he was paid for training or bench time. 2-SER-(277-281). TCS removed him from a project because of poor behavior and issues with coworkers; Slaight did not contend he was replaced by an Indian employee. And he admitted he told TCS that he had to remain in his home area of New York/New Jersey. 2-SER-(282-287).

- **Steven Webber**, while working on a TCS project for Verizon, complained in writing that he could not work with the Verizon employee who supervised him—TCS's customer—because he believed that the man "was having seizures" and therefore "garbling his words." 2-SER-275. He also complained that emails following-up his interview for a Freddie Mac project should have included the Americans who

attended and "spoke American."  He acknowledged at trial that Indians speak English too, but "[y]ou can hear the accent that is different from a native English speaker."  2-SER-(269-274); 3-SER-542.  There was no re-direct.  2-SER-276.

Jurors would naturally and fairly assume this was the strongest evidence the Plaintiff class could muster.

## IV.  THE JURY FOUND TCS DID NOT DISCRIMINATE.

### A.  The Jury Never Questioned The Clear Claim-Based Instructions.

Using a prose format familiar to non-lawyers, the court grouped the jury instructions into Basic Instructions, on the nature of evidence and trial; Claim-Based Instructions; and Closing Instructions on deliberation.  1-SER-(13-21).  Plaintiffs contend the district court "'anticipate[d]' the jury would require additional guidance and believed they would request additional 'clarification or instruction,' at which time the [Plaintiffs'] rejected instructions could be issued."  AOB 19 (citing 2-ER-213 at 1718).  Not so.  What the court anticipated was that jurors would ask questions *if they did need* any clarification, like they had done throughout trial:

> To the extent that they are confused, I anticipate, as is not uncommon, receiving notes from this jury if they need additional clarification or instruction.
>
> But all of those requests from both plaintiffs and defendants, which I have denied, are in the record.

2-ER-213 at 1718. The jury asked no such questions—but did ask for "more flipcharts" (large pads of paper) and Sharpies to assist their work. 4-ER-(556, 558).

The jury deliberated for about nine hours over two days. 4-ER-553.

## B. The Defense Verdict And The Judge's Assessment.

The jury returned a unanimous verdict for TCS. 1-ER-13.

After the jury departed, the trial judge noted a serious hole in Plaintiffs' case: the strong economic disincentive for TCS to terminate anyone who could meet customers' needs.

> [T]here was a question that you never answered on the plaintiffs' side and which I suspect might have been the reason for their verdict, and that is, what was the motive? When you have more jobs available than people applying and the defendant makes money every time they put someone in that position, what is the motive? That question was never answered in this case.

3-SER-527.  The court entered a partial judgment on December 18,

2018.  1-ER-(10-11).[5]

Plaintiffs moved for a new trial, arguing primarily that the

verdict was against the great weight of the evidence.  4-ER-(525-526).

The court denied their motion.  1-ER-3.  "[H]aving closely observed all

of the witnesses (and reviewed the admitted exhibits as they were

presented at trial to those witnesses), the Court [found] no reason to

disturb the jury's apparent choice to place more weight on testimony

presented for TCS than on testimony presented for plaintiffs."  1-

SER-3 n.2.

Plaintiffs appealed.  1-ER-1.

---

[5]  It was partial because one plaintiff alleging failure-to-hire
remained in the case; the court had segregated his claim from the
termination class claims.  4-ER-681.  He resolved and dismissed his
claim in 2019.  4-ER-(521-522).

## SUMMARY OF THE ARGUMENT

The judge and jury gave the Plaintiff class a fair and thoughtful trial, free of prejudicial error. Plaintiffs' case failed because their expert's analysis was not credible, because they themselves were not credible, because TCS convincingly explained the statistical disparities and management emails Plaintiffs relied upon, and because TCS demonstrated both its commitment to equal employment opportunity and its strong financial disincentive to discriminate.

Plaintiffs challenge two jury instructions drafted by the district court. They waived both arguments by affirmatively accepting those instructions, with full knowledge of the controlling law—and as to the second argument, also by taking the opposite position at trial from what they now urge. Appellate review is therefore unavailable for either argument. Alternatively, Plaintiffs forfeited their current arguments because they did not timely object to the district court's instructions when invited and required to do so—such that this Court could, if so inclined, review only for plain error.

Both challenges are meritless anyway. First, Plaintiffs contend the Claim-Based Instructions foreclosed the jury from inferring discriminatory intent based on their statistical evidence, and failed to tell the jury it could infer intent based solely on that evidence. But to reach that conclusion, they isolate pieces of a coherent page of instructions that must instead be read as a whole, making natural connections between related parts. Further, Plaintiffs were not entitled to an instruction that "intent to discriminate *is inferred* [i.e. the intent finding always follows] from a pattern or practice of discrimination, which is proven by statistical evidence." AOB 20 (emphasis added). *Teamsters permits* that inference—and so did the court's instructions here. But the jury decides whether to draw it. Plaintiffs also never offered any more accurate alternative instruction by which this Court could measure the supposed prejudice they claim.

Likewise for their argument that the court's instructions "erroneously drew a distinction between citizenship, race, and national origin discrimination" when "[n]o distinction exists in this case." The instruction on this point did not wholly divorce these two concepts. Nor did it foreclose the jury from inferring race or national

43

origin discrimination from evidence they viewed as citizenship discrimination—if they saw Plaintiffs' frequent references to visa status that way. Instead, this instruction accurately told the jury what Plaintiffs said at the charge conferences: that citizenship discrimination was not at issue. And an adjacent instruction told the jury to consider *all* evidence in assessing Plaintiffs' claims.

Neither of the challenged instructions was error—much less, plain error—and Plaintiffs fail to show any likelihood they would have prevailed absent these supposed errors. On the contrary: Their misleading statistics and conspiratorial interpretation of the TCS "leadership directive" melted in the crucible of trial. And cross-examination exposed dishonesty, unwillingness to relocate, and even racial prejudice among testifying class members—some of whom Plaintiffs' counsel did not even try to rehabilitate. Compared with this, TCS's showing was overwhelming: affirmative evidence of non-discrimination, vigorous diversity efforts, financial investment in developing the American workforce in its industry, and strong incentives to assign every qualified and available employee to projects.

Nor did Plaintiffs preserve their final argument, challenging the court's pre-trial exclusion of evidence related to TCS's external hiring. That ruling *carved out* the category of evidence to which Plaintiffs now argue seven email strings belonged, and told counsel to test the point at trial if they disputed which category any evidence belonged in. Plaintiffs did not.

And regardless, Plaintiffs fail to show any abuse of discretion. The seven email strings they now focus on were isolated anecdotal evidence relating to the recruitment of external candidates, irrelevant or at best minimally probative of the *discriminatory termination* claims on trial. Further, at the time of the *in limine* hearing, the hiring evidence in dispute was (a) voluminous, and (b) no more fairly probative than it had seemed when the court denied certification of a hiring class—a ruling Plaintiffs do not contest.

Finally, the full trial record demonstrates that a defense verdict was likely even if Plaintiffs had proffered these seven email strings and had them admitted. In addition to the record factors noted above, the excluded evidence concerned just one former TCS recruiter and a handful of his project-manager and external-recruiter

45

correspondents, none of whom had anything to do with the termination decisions on trial. Accordingly, even if the jury had interpreted those emails as discriminatory, this evidence would not likely have moved the needle on whether TCS intentionally discriminated against the Plaintiff class.

This Court should affirm the judgment on the jury's verdict and the denial of Plaintiffs' new trial motion.

## ARGUMENT

### I. PLAINTIFFS DID NOT PRESERVE THEIR JURY INSTRUCTION ARGUMENTS, AND REGARDLESS, THE INSTRUCTIONS WERE NOT ERROR.

#### A. Standards of Review.

***For preserved objections—absent here.*** Where a party contemporaneously objected to a jury instruction, this Court reviews "'either de novo or for abuse of discretion, depending on the nature of the error.'" *Crowley v. Epicept Corp.*, 883 F.3d 739, 747 (9th Cir. 2018). The formulation of an instruction is reviewed for abuse of discretion. *Id.* Whether the instruction correctly states the law is reviewed de novo. *Id.*

46

This Court presumes prejudice where instructional error occurred and was preserved, and places on the respondent the burden of showing "it is more probable than not that the jury would have reached the same verdict" regardless of the error. *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1198 (9th Cir. 2019); *City of Long Beach v. Standard Oil Co. of Calif.*, 46 F.3d 929, 935 (9th Cir. 1995) (affirming defense verdict where instructional error was more probably than not harmless).

Those standards of review do not apply, however, when a party fails to timely object. *Crowley*, 883 F.3d at 748. Challenges to jury instructions may be waived or forfeited. *Id.*

***Waived objections—no review.*** Waiver precludes appellate review altogether. *Id.* "Waiver of a jury instruction [argument] occurs when a party considers the controlling law, or omitted element, and, in spite of being aware of the applicable law, proposed or accepted a flawed instruction." *Id.* (internal quotation marks omitted) (waiver where appellants "after a jury instruction conference, explicitly agreed to use the instruction" complained of).

***Forfeited objections—discretionary review for plain error***

***only.*** Forfeiture occurs when a party fails to timely assert a right. *Id.* Failure to timely object to a jury instruction forfeits the objection. *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1072-73 (9th Cir. 2020) (en banc) (proffer of desired instruction was "necessary but not sufficient to preserve the objection").

For years this Court treated the failure to timely object to a civil jury instruction as a waiver precluding appellate review. *Chess v. Dovey*, 790 F.3d 961, 970 (9th Cir. 2015) (recounting past practice). But following a 2003 amendment to Federal Rule of Civil Procedure 51, the Court now has the discretion to review, for *plain error*, a jury instruction to which appellant did not object. *Id.*; *see* Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights.")

When reviewing a civil jury instruction for plain error, this Court considers whether "(1) there was an error; (2) the error was obvious; and (3) the error affected substantial rights." *C.B. v. City of*

*Sonora*, 769 F.3d 1005, 1018 (9th Cir. 2014) (en banc).  Appellant has the burden of demonstrating plain error.  *See id.* at 1021.

The bar is high.  In the civil context, "plain errors should 'encompass[ ] only those errors that reach the pinnacle of fault envisioned by the standard set forth above.'"  *Id.* at 1018 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002)).  And even where appellant shows that much, correction of plain error is discretionary; this Court does so only when necessary "to prevent a miscarriage of justice, meaning that the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  *City of Sonora*, 769 F.3d at 1018-19 (internal quotation marks omitted).  Such cases are extremely rare.  *Skidmore*, 952 F.3d at 1073-74.

### B. Plaintiffs Waived, Or At Least Forfeited, The Jury Instruction Arguments They Now Raise.

To preserve their two jury instruction arguments for anything but plain error review, Plaintiffs had to timely object on the grounds they now raise.  They did not.  In fact, despite full awareness of the applicable law, they affirmatively accepted the instructions they now challenge.  Those waivers foreclose appellate review.

### 1. Plaintiffs abandoned any request for the proof instructions to include the language they now say was required, and they approved the court's instruction "as written."

Plaintiffs say they "proposed jury instructions reflect[ing the] law" that "intentional discrimination is inferred from proof of a pattern or practice, and a pattern or practice can be proven with statistics alone," but the court rejected them. AOB 31. They contend the court "erroneously instructed the jury that Plaintiffs were required to prove a pattern or practice separate and apart from intentional discrimination and that statistics were sufficient only to prove a pattern or practice." *Id.* Deferring the accuracy and merits of these arguments for now, we summarize the process leading to the Claim-Based Instructions, and show that Plaintiffs did not preserve this argument.

Title VII class actions are rarely tried, and virtually no standard jury instructions exist.[6] A month before this trial, relying

---

[6] There is one, titled "Pattern or Practice," that "does not use the word 'intent.'" AOB 37 (citing Seventh Circuit Pattern Jury Instructions § 3.03 (2017)). It is unclear whether that instruction is meant for disparate-treatment cases; the Comments are sparse. *Id.* But if so, it erroneously obscures a proof requirement that the

on *Teamsters* and other federal case law, the parties filed a set of

competing proposals with extensive argument. *See* 4-ER-(588-648).

The substantive issues appeared in the "5 series." 4-ER-(590-591).

Plaintiffs now claim that their original proposals numbered 5.2

and 5.9 "would have allowed the jury to infer intentional

discrimination from a pattern or practice proven with statistical

evidence." AOB 33 (citing 4-ER-(597-600, 620-623)). But those

instructions *never mentioned* "infer[ring] intentional discrimination,"

a key requirement in this disparate treatment case. 4-ER-597, 620.

They spoke only about statistical proof of a pattern or practice of

discrimination—as if this were a disparate *impact* case. *See*

*Teamsters*, 431 U.S. at 335 n.15 ("Proof of discriminatory motive, we

have held, is not required under a disparate-impact theory.") They

kept *silent* on Plaintiffs' burden to prove intent. Such proposals could

not preserve Plaintiffs' argument that the court should have

explained more about what "suffices to prove intent." AOB 31

(capitalization normalized).

---

Supreme Court deemed "critical" in such cases. *Teamsters*, 431 U.S.
at 335 n.15.

As explained, *Teamsters* called proof of discriminatory intent "critical" in a disparate-treatment class action, like this case. 431 U.S. at 335 n.15. Plaintiffs admitted at the first charge conference that they had to show "intentional discrimination," and the court stated its plan to so instruct the jury. 2-SER-(199, 244-245).

Indeed, at that first conference (November 9, 2018), the court announced it would rewrite the whole 5-series. 2-SER-196. Anticipating this, TCS filed that morning Alternative Instructions that condensed the 5-series proposals and tried to account for some of Plaintiffs' objections. *See id.*; 2-SER-(181-189). The court and counsel discussed both parties' proposals at length. 2-SER-(197-263). When the discussion returned to Plaintiffs' burden to prove intent, the court correctly resisted Plaintiffs' efforts to *equate* statistical disparities with intentional discrimination. 2-SER-(246-247, 262). Plaintiffs' counsel responded: "I understand your point. It's an interesting issue." 2-SER-262.

Plaintiffs' next proposal, also cited as preserving their current argument, continued to improperly equate statistical disparities with intentional discrimination, rather than "allow[ing] the jury to infer

intentional discrimination from a pattern or practice proven with statistical evidence." AOB 33. That proposal, filed on November 16 for the continued charge conference that day, said in part: "For our purposes, discrimination *is* intentional if it is done as a regular pattern …." 4-ER-580 (emphasis added). Plaintiffs admit that this "*define[d]* intent by reference to a pattern-or-practice of discrimination." AOB 33 (emphasis added). Again, such an instruction would have violated *Teamsters*. *See* Stmt. §I-C above.[7]

Lastly, Plaintiffs cite their November 16 oral argument in support of this same instruction. AOB 33 (citing "ER 194 at 1583" [more of the same effort to equate statistical disparity with intent[8]] and "195 at 1585" [citing *Teamsters* and two cases the Opening Brief does not include]).

---

[7] Plaintiffs cited no authority for their proposal, referring only to an instruction supposedly given by a New York trial judge. 4-ER-580.

[8] Plaintiffs argued in reliance on *Hazelwood School Dist. v. U.S.*, 433 U.S. 299 (1977) that "if there's a statistical disparity" of more than two standard deviations, it "is typically evidence of intent." But *Hazelwood* reversed the Court of Appeals for "disregard[ing] the possibility that this prima facie statistical proof in the record might at the trial court level be rebutted." 433 U.S. at 308–309. Thus *Hazelwood* confirms that a statistical prima facie case does not always "conclusively prove[] [a] 'pattern or practice' lawsuit." *Id.*

Plaintiffs never proposed any instruction that *allowed* the jury to infer intent from Plaintiffs' statistical showing—as they now complain the court's instructions failed to do. Nor did they argue this position below. Having not objected on the grounds they now raise on appeal, Plaintiffs forfeited this argument, at least.

But Plaintiffs' conduct became far more acute, waiving this argument.

As the November 16 conference ended, the court and parties agreed to segregate the "Phase I" instructions, closings, and deliberations into three sub-verdicts. The jury would decide the basic question of discrimination liability first, and if Plaintiffs prevailed, further instructions and argument would follow. 3-SER-(453-454). The court said it would send counsel the court's own drafts of jury instructions and verdict forms before trial resumed on November 26, 2018. 3-SER-453.

The court did so by email on Saturday morning, November 24. *See* 3-SER-(462, 468). Plaintiffs did not place that transmission in the written record—but the court read each relevant part aloud, seeking comments or objections as discussed below.

When trial resumed, counsel informed the court that evidence was likely to end midday, with no rebuttal case. 3-SER-(460-461). The court thus invited "comments on the substantive instructions." 3-SER-462. At this third charge conference, counsel for both sides offered objections and proposed edits to the court's draft instructions on discrimination liability, and the court made revisions. 3-SER-(462-471, 486-487). In fact, TCS focused on language about which Plaintiffs now complain ("Statistics alone can be sufficient to establish the element of a pattern or practice"), but Plaintiffs said nothing. 3-SER-(464-465).

With the jury waiting, the court truncated that discussion, but returned to it after evidence closed—reading aloud its November 24 draft Claim-Based Instructions line-by-line. 3-SER-(471-472, 486-501). This was Plaintiffs' opportunity, under Federal Rule 51(b)(2), "to object on the record and out of the jury's hearing before the instructions and arguments [were] delivered." But instead, Plaintiffs' counsel *expressly approved* the court's claim-element and proof-burden instructions—securing several small changes but never raising the now-claimed errors:

THE COURT:  … So the elements of the claim read as follows: Plaintiffs bring this class action under Title VII of the Civil Rights Act of 1964, commonly referred to as Title VII, and the Civil Rights Act of 1866, commonly referred to as Section 1981.

Is that sufficient?

MR. VON KLEMPERER [Plaintiffs' counsel]: Yes, Your Honor.

MS. HEPLER [TCS's counsel]: Yes, Your Honor.

THE COURT: To succeed on this claim --

MS. HEPLER: Perhaps "their claims."

MR. VON KLEMPERER: Or "these claims."

THE COURT: Because there are two.

To succeed on these claims, plaintiffs must prove by a preponderance of the evidence that TCS had, one, a pattern and practice, two, of intentionally discriminating on the basis of race or national origin against non-South Asians and non-Indian employees, three, who were benched and then terminated.

***Anything on what I've said so far?***

MS. HEPLER: Your Honor, I believe Element 2 would be clearer if we said "of intentionally discriminating on the basis of race against non-South Asians or on the basis of national origin against non-Indian employees."

MR. VON KLEMPERER: Your Honor, ***we think it's quite clear as it's written***.  My only comment would be to remove the "s" from non-South Asians so that it's non-South Asian and non-Indian employees.

THE COURT: All right.  I'll consider both of those.

Anything else?

MR. VON KLEMPERER: In the Element 1, I believe Your Honor said "pattern and practice."  Lower down

it says "pattern or practice." And *we would just ask* that they be consistent to not confuse the jury.

THE COURT: All right. I'll go back and look at that.

Anything else?

MS. HEPLER: Not from what you read so far, Your Honor.

THE COURT: Okay.

If you find plaintiffs have proved each element referenced above, you should reach a verdict in favor of plaintiffs. If you find that they have not, your verdict should be for the defendant.

As used herein, a pattern or practice or a pattern and practice means a regular practice rather than an unusual one. It requires more than mere occurrence of sporadic or isolated incidents of discrimination or insensitive remarks. The pattern and/or practice may be established without proving that discrimination as to every class member.

And I know that the defendants have asked for an additional reference to standard operating procedures. I've not looked at that yet.

Anything else on this one?

MR. VON KLEMPERER: And we would oppose the inclusion of that additional language. *We think it's clear as written*.

3-SER-(493-495) (emphasis added).

The court proceeded to read all the Claim-Based Instructions,

including the final portion about which Plaintiffs now complain:

THE COURT: Next, types of evidence, to which I understand the defendants object. But as it is, it reads: In deciding whether plaintiffs have proved

57

their claim by a preponderance of the evidence, you may consider direct and/or circumstantial evidence to prove each element of the claim. In this kind of case, a jury may consider anecdotal evidence and statistical evidence. ***Statistics alone can be sufficient to establish the element of a pattern and/or [in final: "or"] practice***, but as with all evidence, you should give statistical [in final: "this"] evidence the weight it deserves, or something to that effect.

***Anything on that further?***

MR. VON KLEMPERER: ***No, Your Honor.***

3-SER-497 (emphasis added).

Plaintiffs had one more opportunity to object. The court emailed the instruction set resulting from the morning conference (and revised verdict forms) to counsel that afternoon. 3-SER-501. That transmission told counsel that "to the extent that there were other objections, [counsel] were to advise the Court and opposing counsel and then return to the courtroom at 4:00 p.m." *Id*. Court did reconvene at that time, at TCS's request, to address the verdict forms, but Plaintiffs raised no further objections. 3-SER-(501-517).

So Plaintiffs did not merely forfeit their first argument. Plaintiffs did not just fail to propose the instruction they now argue was required, and did not just fail to timely object to the court's

planned instructions. In fact, Plaintiffs offered proofreading edits to the court's instructions, deemed them to be otherwise "clear as written" (twice), and disclaimed any substantive objection. All this, after they listed at the prior conference the cases on which they rested their earlier positions. This conduct conveyed to the court that whatever Plaintiffs previously thought about the need for language concerning statistical evidence and intent, they decided that the court's "clear" formulations discussed on November 26 sufficed.

Their waiver precludes appellate review of this argument. In open court, Plaintiffs "'consider[ed] the controlling law, or omitted element, and, in spite of being aware of the applicable law, … accepted [the assertedly] flawed instruction.'" *Crowley*, 883 F.3d at 748.

> **2. Plaintiffs abandoned their argument for connecting citizenship discrimination to their race and national origin claims, and approved the court's instruction on citizenship.**

Plaintiffs contend that the instruction addressing citizenship discrimination "should have been omitted altogether or modified to clarify that when citizenship discrimination has the purpose or effect

of discriminating on the basis of race or national origin, the conduct violates Title VII." AOB 42-43. They waived these arguments too.

Weeks before trial, Plaintiffs did argue the potential overlap they now claim between citizenship discrimination and race or national origin discrimination. 4-ER-612 (second paragraph of "Plaintiffs' Position" in initial set of competing jury instructions, citing cases); *see also* 1-ER-(18-19). So they were well aware of it.

But Plaintiffs abandoned that argument at the November 9 and 16 charge conferences, never contending the court should explain an "overlap between citizenship discrimination and race or national origin discrimination" (AOB 44)—much less that "[t]his overlap made an appropriate instruction essential" (AOB 45).

On the contrary, Plaintiffs requested there be no instruction about citizenship discrimination, because it was *not at issue*.

- In response to TCS's proposed instruction, Plaintiffs said on November 9: "We don't think they need to be instructed about citizenship discrimination" and "I don't think it makes sense to instruct the jury on what discrimination is not at issue in this case." 2-SER-(224-225). The court deferred

further discussion on the point to the next conference.  2-SER-(229-230).

- TCS proposed on November 16 that the court instruct the jury:  "National origin differs from citizenship.  Plaintiffs do not claim discrimination based on citizenship status."  3-SER-(376-377).  Plaintiffs again argued that citizenship discrimination was "not at issue":

> THE COURT: …  I'm looking at docket 646.  I have [TCS's] revised instruction on citizenship.
> Do I have something on that topic from the plaintiff?
> MR. VON KLEMPERER:  ***No, we didn't submit anything on that.***
> THE COURT:  Do you have any -- looking at it, do you have any comments that you can speak to, if any?
> …
> MR. KOTCHEN: We think the instruction itself was designed to confuse the jury, and ***we don't think that there's a reason for there to be an instruction about what's not at issue here***.
> THE COURT: Okay. ***Anything else?***
> MR. KOTCHEN: ***No***, Your Honor.

3-SER-(451-452) (emphasis added).

Having abandoned their pre-trial contention about the connection between citizenship discrimination and race/national

original claims—to argue instead that their case was *not about* citizenship discrimination—Plaintiffs cannot now circle back to their original position. *See* AOB 2 ("No distinction exists in this case" between "citizenship, race, and national origin discrimination."), 42-45.

And if Plaintiffs wanted instead an instruction such as they now argue was "critical," they could have proposed one as part of their November 16 supplemental set. They did not (3-SER-(407-410))—instead resisting any instruction on citizenship discrimination.

But they abandoned that resistance, too. During the November 26 hearing devoted to review of the court's draft instructions, the court read into the record (as previously noted) each line of the draft Claim-Based Instructions it had emailed, seeking comment or objection. Plaintiffs were required to object "on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. Rules Civ. Proc. 51(c). Instead, they chose to accept the court's citizenship instruction—exactly the one the court gave the next day:

> THE COURT: [Reading:] Plaintiffs do not assert claims based on citizenship or immigration status itself but, rather, race and/or national origin.

> *Anything on that addition?*
>
> MR. VON KLEMPERER: *No.*

3-SER-497 (emphasis added). Further, Plaintiffs did not object at the final hearing convened for that purpose, later that day. 3-SER-(501-517).

***

In sum, the record confirms that "in spite of being aware of the applicable law," Plaintiffs accepted the instructions they now claim were flawed. These waivers foreclose appellate review of their instruction arguments. *Crowley*, 883 F.3d at 748.

But even if the Court declines to find waivers, then at a minimum, Plaintiffs forfeited both of their current arguments by their failure to timely object on those grounds at any of the four charge conferences. *Id.*; *Skidmore*, 952 F.3d at 1072-73. This leaves Plaintiffs with, at most, plain error review, if the Court exercises its discretion to review at all.

### 3. The pointless formality exception does not apply.

Plaintiffs suggest they know of their waiver problems, but do not confront them. They comment generically, in a footnote, that "imperfectly preserved objections" still warrant de novo review "if continuing to press the issue would have been a 'pointless formality.'" AOB 30 n.9.

This cannot suffice. It fails to candidly "identify the applicable standard of review." Circuit Rule 28-2.5. And if Plaintiffs contend the pointless formality exception applies here, they needed to explain that position in their Opening Brief. *See*, *e.g.*, *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.4 (9th Cir. 1996) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal.")

Any such argument made in Plaintiffs' reply brief, if entertained at all, should be rejected. The pointless formality exception to the requirement of timely objection does not excuse Plaintiffs' express *agreement* to the court-drafted instructions on November 26. Instead that doctrine excuses silence on an objection that a party has repeatedly made, where "'it is clear from the record that the court

64

knew the party's grounds for disagreement with the instruction'" and "'the party offered an alternative instruction.'" *Chess*, 790 F.3d at 971 (quoting *United States v. Payne*, 944 F.2d 1458, 1464 (9th Cir. 1991)).

As for the proof instructions, Plaintiffs never offered any alternative clarifying how the jury could infer intentional discrimination. *See* Arg. §I-B-1., above. Their original proposal 5.9 discussed inferring discrimination from statistical evidence, but did not state the actual fact they needed inferred: *intentional* discrimination. 4-ER-620. Conversely, the instruction they proposed on November 16 acknowledged they needed to prove intentional discrimination, but eliminated the jury's *discretion* to infer that intent, stating that "discrimination *is* intentional if it is done as a regular pattern." 4-ER-580 (emphasis added).

Furthermore, nothing Plaintiffs argued at any conference alerted the court to their current grounds for disagreement with the instruction. They did not argue any particular way the instructions should explain the *available inference* of intentional discrimination from statistical evidence of a pattern or practice. Instead, as shown above, they tried to get the court to *equate* statistical disparities with

intentional discrimination.  The court rightly refused the latter, but never refused the former.  Nothing in the record indicates that it would have been futile to request, at either of the November 26 conferences, the changes to the court's instructions that Plaintiffs now argue were required.

Plaintiffs likewise cannot establish that it would have been futile to object to the court's draft citizenship-discrimination instruction.  The court evidently thought the draft reflected what Plaintiffs had argued—that they "[did] not assert claims based on citizenship or immigration status itself."  1-ER-15; 2-SER-(224-225); 3-SER-(451-452).  But if Plaintiffs still preferred to have no instruction at all, they should have said so on November 26.  Nothing indicates the court was immovable on this point; it had expressed ambivalence at the initial conference.  2-SER-(224-230).  Instead Plaintiffs assented.  Nor was it pointless to challenge the instruction's phrasing; the court accepted several changes to the Claim-Based Instructions on November 26, from both sides.  *Compare* 1-ER-15 *with* 3-SER-(464-465, 493-495).

Plaintiffs cannot establish the pointless formality exception. They waived both of their jury instruction arguments, barring review. Still, in the event the Court finds only forfeiture (or somehow, adequate preservation), the Court should reject these arguments under any review standard.

### C. The Instructions Were Not Error, Let Alone Plain Error.

Plaintiffs cannot demonstrate plain error without error, and there was none in the district court's instructions. Thus, under either plain error or de novo review, the Court should affirm.

#### 1. The instructions properly guided the jury's consideration of Plaintiffs' statistics to prove intent.

Plaintiffs over-parse the Claim-Based Instructions on the elements of their claims and how they could prove them. Those instructions did not suffer from the claimed infirmity when read as a coherent whole. *See, e.g.*, *Swinton v. Potomac Corp.*, 270 F.3d 794, 807 (9th Cir. 2001) (court should not examine "any one jury instruction in isolation"); *Frost*, 914 F.3d at 1194 (instructions as a whole must fairly and correctly cover substance of applicable law).

Plaintiffs' argument centers on elements 1 and 2. The court instructed the jury that Plaintiffs had to prove TCS had:

1. a pattern or practice

2. of intentionally discriminating on the basis of race against non-South Asian employees or national origin against non-Indian employees

3. who were benched and then terminated.

1-ER-15.

Plaintiffs first posit that elements 1 and 2 "were distinct and had to be proven separately." AOB 31-32 (noting the instruction went on to say that Plaintiffs had to prove "each element referenced above," emphasis omitted). Relying on that premise of complete distinction between elements 1 and 2, Plaintiffs insist that a sentence near the end of the Claim-Based Instructions misled the jury: "Statistics alone can be sufficient to establish the element of a pattern or practice." 1-ER-15. According to Plaintiffs, this means "[t]he jury was never instructed that it could infer the second element from the pattern or practice or from statistical evidence." AOB 32-33.

On the contrary, that concept was clear from a natural reading of the Claim-Based Instructions as a whole—and indeed, *stated* in a sentence the Opening Brief omits.

Elements 1 and 2 were not wholly independent. Jurors had to connect them because neither "pattern" nor "practice" has any meaning without "of ___." A pattern or practice of what? The answer was right there on the next line: of intentionally discriminating. 1-ER-15. And that was indeed Plaintiffs' proof burden in this disparate-treatment case. *See* Stmt. §I-C, above.

With that connection clear, the district court properly enumerated these two related pieces of Plaintiffs' proof burden to convey that a "pattern" across the class does not *automatically establish* intentional discrimination. *Teamsters*, 431 U.S. at 335 n.15, 339-340 and n.20, 360 and n.46 (statistically significant pattern of employment decisions *can be* prima facie evidence of intentional discrimination, but an employer can use any appropriate evidence to rebut); *Hazelwood School Dist.*, 433 U.S. at 307-309 (reversal for "disregard[ing] the possibility that this prima facie statistical proof in the record might at the trial court level be rebutted"); *see also Coral*

69

*Const. Co. v. King Cty.*, 941 F.2d 910, 919 (9th Cir. 1991) ("Statistical evidence often does not fully account for the complex factors and motivations guiding employment decisions, many of which may be entirely race-neutral."), *overruled on other grounds by Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019).

The next question is whether the instructions adequately conveyed that the jury "could infer the second element [intentional discrimination] from the pattern or practice or from statistical evidence." AOB 32-33. The answer is yes. Plaintiffs ignore this sentence in the Claim-Based Instructions:

> In deciding whether plaintiffs have proved their claim by a preponderance of the evidence, you may consider direct and/or circumstantial evidence to prove *each element* of the claim.

1-ER-15 (emphasis added). Statistical evidence is circumstantial evidence. This instruction directly authorized the jury to consider circumstantial evidence, including statistical evidence, in support of *any* element. And Plaintiffs argued their statistical evidence in closing as a basis to find "a pattern or practice of intentional

70

discrimination." 3-SER-(522-523). Thus, Plaintiffs' protests about "tying the use of statistics only to a pattern or practice but not to intentional discrimination" are baseless. AOB 34.

Still, Plaintiffs contend the district court did not go far enough in empowering the jury's use of their statistical evidence. After the sentence discussed above, the court instructed:

> In this kind of case, a jury may consider anecdotal evidence and statistical evidence. Statistics alone can be sufficient to establish the element of a pattern or practice. As with all evidence, you should give this evidence the weight you think it deserves.

1-ER-15. This paragraph actually drew special attention to Plaintiffs' statistical evidence—which TCS had opposed. *See* 3-SER-(464-465); 2-SER-(237-239). But Plaintiffs complain that the second sentence implied statistics alone could *not* suffice to establish the element of intentional discrimination. AOB 33 (citing dissent, without so noting, in *Drinkard v. Johnson*, 97 F.3d 751, 773 (5th Cir. 1996)); AOB 37-38.

This argument depends on Plaintiffs' faulty premise that their proof had to be "separate" for "(1) 'a pattern or practice'; and (2) 'of intentionally discriminating ....'" AOB 31-32. As shown above, these elements were connected. Further, the instruction that statistics

71

alone could suffice to establish a "pattern or practice" must be read in context:  the *only* required pattern or practice was one of intentional discrimination.  *See* 1-ER-15.  Thus the instructions effectively conveyed that statistical evidence could suffice to prove intentional discrimination.  The jury was simply not persuaded by *Plaintiffs'* statistical evidence that the purported pattern or practice reflected intentional discrimination.

Finally, Plaintiffs argue that "[t]he court's instruction failed to inform the jury that intentional discrimination *is inferred* from a pattern or practice of discrimination, proven by statistical evidence." AOB 34 (emphasis added), 37.  As already explained, Plaintiffs were not entitled to an instruction erroneously implying that intentional discrimination is always so inferred; the jury had to be given discretion to draw that inference or not.  Plaintiffs tangentially acknowledge this law.  *See* AOB 34 (upon a prima facie pattern-or-practice showing, "'[t]he required discriminatory intent may be inferred'") (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 914 (4th Cir. 2015)); AOB 35 (statistical disparities of sufficient size lead to conclusion of intentional discrimination "in the absence of evidence to

the contrary") (quoting *Castaneda v. Partida*, 430 U.S. 482, 494 n.13 (1977)).

In sum, the instructions did authorize—but properly did not require—the jury to infer intentional discrimination from Plaintiffs' statistical evidence.

### 2. The verdict likely would have been the same with Plaintiffs' newly proposed changes.

Because Plaintiffs forfeited this jury instruction argument, TCS need not carry any burden of showing that the verdict likely would have been the same absent the claimed error. *See* Arg. §I-A. But TCS does so, in explaining why Plaintiffs' contrary effort fails.

*First,* no "extra element" was added to their proof burden for the reasons explained. In summary: Element 2 (beginning with "of") had to be read in light of element 1. The district court separated them only enough to allow the jury to decide whether to infer intentional discrimination (#2) from Plaintiffs' pattern evidence (#1), i.e. their statistics. Plaintiffs' argument that the claimed error prejudiced them depends on their incorrect rendition of the law:

"Intentional discrimination is [without exception] inferred from the pattern or practice." AOB 38.

***Second,*** Plaintiffs offer no *correct* alternative instruction (just like they failed to below)—so there is no standard by which to judge whether the outcome likely would have been the same.

- They say the district court "could have remedied its error" if it had "omitted the term intent from the instruction altogether." AOB 37. But *Teamsters* forecloses that. An element of proof that the Supreme Court called "critical," in the decision controlling this disparate-treatment class action, could never properly have been omitted from the Claim-Based Instructions. 431 U.S. at 335 n.15.

- Alternatively, Plaintiffs say, the court "could have combined the pattern or practice and intent instructions and explained that *intent is inferred* from a pattern or practice of discrimination, which is provable through statistics alone." AOB 37 (emphasis added). But again, "is inferred" would have been wrong—misleading the jury

to think that proof of a pattern or practice *requires* that inference.

***Third,*** suppose Plaintiffs had actually proposed either of these changes to the district court on November 26, and the court had accepted either of them. The jury would still have heard that Plaintiffs had to prove TCS had *a pattern or practice of discriminating* in terminations on the basis of race or national origin. The evidence in the record overwhelmingly established that TCS did not. *See* Stmt. §§II-III. Plaintiffs say that because their statistical evidence was "extremely strong," they would then have gained more benefit from the instruction allowing the jurors (or pushing them, with the inclusion of "is inferred") to rely on statistics alone to establish a discriminatory pattern or practice. AOB 39-40. But in fact, their statistical evidence failed in ways that would have left the jury equally unpersuaded even with the instructions Plaintiffs now invent. *See* Stmt. §II-A.

***Finally,*** the hole in Plaintiffs' case that the district judge identified after the verdict would have remained, independent of the claimed instructional error: "When you have more jobs available than

people applying and the defendant makes money every time they put someone in [those] position[s], what is the motive [to terminate non-Indians]? That question was never answered in this case." 3-SER-527. Where the district judge perceived a rational "reason for the[] verdict" (*id.*) that went to the basic unlikelihood of disparate treatment, this Court cannot conclude the verdict would have been any different under Plaintiffs' changed instructions.

> **3. The instruction on citizenship discrimination was not misleading, and the verdict would likely have been the same without it.**

Plaintiffs' second argument challenges language near the bottom of the Claim-Based Instructions:

> Plaintiffs do not assert claims based on citizenship or immigration status itself, but rather race and/or national origin.

1-ER-15. Of course, citizenship itself "is not a facially unlawful criterion for employment decisions under Title VII." AOB 43. And Plaintiffs did repeatedly tell the district court that this case was *not about* citizenship discrimination (Arg. §I-B-2)—which this instruction clarified for the jury, given Plaintiffs' frequent discussion of visa status at trial. The instruction then reminded the jury what

Plaintiffs actually claimed: "race and/or national origin" discrimination. 1-ER-15. All this was fair and accurate.

Still, Plaintiffs contend that this instruction "left [the jury] to believe that citizenship discrimination and race or national origin discrimination are mutually exclusive concepts," when the law provides that citizenship discrimination can violate Title VII if it "has the 'purpose or effect' of discriminating on the basis of race or national origin." AOB 43-44 (quoting *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 92 (1973)). They say this instruction "should have been omitted altogether or modified to clarify" the *Espinoza* holding. AOB 42-43. Of course they declined the court's invitation to modify this instruction. *See* Arg. §I-B-2. But regardless, the instruction was proper as given.

The instruction did *not* divorce citizenship discrimination entirely from Plaintiffs' claims. It was more nuanced: "Plaintiffs do not assert claims *based on* citizenship or immigration status *itself*, but rather race and/or national origin." 1-ER-15 (emphasis added). This left room for the jury to infer some residual relevance to citizenship evidence.

Nor could it have led to the harm Plaintiffs assert: the jury concluding "that because the evidence of discrimination was correlated with citizenship, then it was not proof of race and national origin discrimination." AOB 44. First, the instruction does not discuss types of evidence at all, and cannot reasonably be read to limit Plaintiffs' means of proof that way. Second, the instruction must be read together with another that told the jury to "base [its] decision on all of the evidence" (1-SER-14)—leaving no doubt about how to harmonize the two. There is no reasonable probability that this instruction confused jurors about the relevance of Plaintiffs' "leadership directive" evidence or Plaintiffs' evidence that some TCS positions (less than 1%, the same as for locals) were marked "expats only." AOB 45; 2-SER-(129-130, 300:21–302:5).

This instruction, like the remainder of the Claim-Based Instructions, was not error—and was far from plain error.[9]

---

[9] For the reasons in this section and Argument § I-B-2, Professor Ontiveros' *amicus* brief is irrelevant. There is no dispute about *Espinoza*'s holding. But *Plaintiffs* repeatedly argued below that citizenship discrimination was "not at issue" in this race and national origin discrimination case. The instructions told the jury so, without foreclosing an evidentiary connection between the two. Moreover,

## II. PLAINTIFFS FORFEITED THEIR EVIDENCE-EXCLUSION ARGUMENT, AND REGARDLESS, EXCLUDING HIRING EVIDENCE FROM A TRIAL ABOUT TERMINATIONS WAS NOT ABUSE OF DISCRETION.

Plaintiffs mischaracterize the ruling they complain of. They argue that, on TCS's Motion in Limine No. 9, the district court "abused its discretion by excluding emails that showed [TCS] decisionmakers made personnel decisions on the basis of race and national origin when staffing client projects, which went to the core of Plaintiffs' pattern-or-practice claims." AOB 45-46, 58-59. No such ruling occurred. The court never categorically excluded emails about personnel decisions made when staffing client projects. Just the opposite. And the actual ruling—to exclude exhibits related to *external hiring*—was not error, much less prejudicial error.

### A. The Rejection Of A Hiring Class.

Plaintiffs sought certification of a "hiring class" composed of non-Indian/South Asian persons "who sought a position with [TCS] in the United States and were not hired between April 14, 2011 and the

---

*amicus* ignores most of the evidence, resting her arguments on Plaintiffs' one-sided view of the facts. *See* Amicus Br. at 4, 8, 12.

date of class certification." 1-SER-35. The district court denied certification (1-SER-47) because Plaintiffs "fail[ed] to offer sufficient proof that TCS 'operated under a general policy of discrimination' with regard to the proposed Hiring Class." 1-SER-39 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353 (2011)). That ruling is final.

## B. The Court's Actual *In Limine* Ruling, And Plaintiffs' Failure To Offer Proof At Trial.

Despite the court's denial of class certification as to external hiring practices, Plaintiffs' initial exhibit list included many documents about external hiring, and other evidence TCS believed was irrelevant to the termination class. TCS's Motion in Limine No. 9 argued that to avoid waste of time and jury confusion, Plaintiffs should be precluded from presenting any evidence on matters outside the certified-class definition. 4-ER-655.

TCS specifically asked the court to exclude certain external-hiring emails. 4-ER-(655-657, 660-668). All seven emails that Plaintiffs now point to reflected a few project managers and outside recruiters working through one former TCS employee (Brian Galicki), to limit specific external searches to persons of Indian descent or

"desis."  *See* AOB 48-52; 3-ER-ii and 263-290 (often noting position required extensive coordination with India).  TCS emphasized at the hearing that Galicki "had nothing to do with the Resource Management Group, had nothing to do with the placement of expats or existing local employees into projects," and therefore nothing to do with the termination class.  1-ER-21.

The district court ruled: "I'm going to grant it as to evidence regarding hiring; deny it as to everything else."  1-ER-23.  The court said it could not distinguish which exhibits the ruling would exclude from among the "binder and a half" submitted.  *Id.*  So it directed the parties both orally (*id.*) and in writing to raise the point at trial if they disputed any specific exhibit:

> The motion is GRANTED IN PART as to evidence of discrimination in hiring and DENIED IN PART as to the remaining evidence, including evidence [of] non-hiring discrimination against non-class members.  To the extent that parties cannot agree whether a particular piece of evi[de]nce relates to hiring discrimination, they may raise the issue with the Court at trial.

ER 27-28.

Thus the court specifically *declined* to exclude evidence suggesting "non-hiring discrimination"—whether related to "staffing client projects" (AOB 45) or otherwise.  The Opening Brief argues that all seven challenged exhibits "***Arose in the Context of Staffing Open Positions on Client Projects***."  AOB 59 (heading); *see generally* AOB §III-C.  If Plaintiffs saw it that way, the court's order left the door wide open to seeking admission of these emails at trial.

But Plaintiffs never did so.  They forfeited this argument by failing to offer any of these exhibits at trial to seek a determination— as the *in limine* order directed—whether they fell in the excluded "hiring" category or could instead be seen as evidence of how TCS staffed projects.  *See* Fed. R. Evid. 103(a)(2), 103(b); *Adkins v. Mireles*, 526 F.3d 531, 542 (9th Cir. 2008) (forfeiture, and no appellate review, where "district court did not have the opportunity to issue a final order").  Plaintiffs' offer of proof would also have had to establish hearsay exceptions for these emails, which was doubtful.  This Court cannot know how Plaintiffs would have done that because they did not make a record.

## C. Standard of Review, If Any.

Review is foreclosed, as set forth above. But if the Court were to consider this argument, then "abuse of discretion is the proper standard of review of a district court's evidentiary rulings." *General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 759 (9th Cir. 2017).

Plaintiffs rely on *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1009 (9th Cir. 2007) for the proposition that de novo review applies "'[w]hen the district court fails to make an explicit finding of Rule 403 balancing on the record." AOB 46-47, 62-63. They are wrong. First, *Engquist* acknowledged contrary authority immediately after the quoted sentence. 478 F.3d at 1008 n.27 (citing *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1034 (9th Cir. 2003)) (abuse of discretion review even where district court did not cite Rule 403, where "it seem[ed] likely that the court was concerned about the prejudicial effect" of the evidence). And second, *Engquist* actually held "that the district court *did not abuse its discretion* in granting Defendants' motion in limine to exclude the [disputed item] from evidence." 478 F.3d at 1010 (emphasis added); *id.* at 1009 (district

court "likely relied on Rule 403 in deciding to exclude the evidence," as in *McEuin*).

Here too, the district court likely relied on Rule 403 in deciding to exclude the evidence. The ruling partially granted a motion that emphasized undue prejudice and delay more than pure irrelevance. *See* 4-ER-(655-657). The court expressed concern at the *in limine* hearing about the large volume of exhibits at issue (1-ER-23), and later noted its persistent efforts to get the parties to streamline the volume of evidence for trial (1-ER-7, n.4). Finally, the court explained in its order denying Plaintiffs' new trial motion that, when ruling *in limine*, it had "reviewed numerous representative documents and made judgment calls based on the relevance *and* probative value related to the termination case itself, having previously found insufficient common evidence to support a class action for a 'hiring' case." 1-ER-7 (emphasis added). The phrase "probative value" adds meaning beyond "relevance," evoking Rule 403's balancing test. This discretionary ruling is reviewed—if at all—for abuse of discretion.

### D. The Exclusion of Hiring Evidence Was Well Within The Court's Broad Discretion.

Plaintiffs argue that seven project-level email strings about external hiring requests, all revolving around one former recruiter, with the latest dated January 2014 (see 3-ER-(275-276)), were relevant to show that TCS intentionally discriminated in terminations between April 2011 and December 2017.

It is settled that anecdotal evidence is too weak to support the existence of a companywide discriminatory scheme where the instances are few, and are drawn from only certain regions or work locations. *See Wal-Mart v. Dukes*, 564 U.S. at 358 ("Even if every single one of these accounts is true, that would not demonstrate that the entire company 'operate[s] under a general policy of discrimination'"). This disposes of Plaintiffs' core argument that these seven email strings showed that [TCS] discriminated intentionally" against non-Indians. AOB 52-53, 57, 66; *id.* at 54, 58, 60, 65 (claiming these emails showed "'the employer's animus'" or TCS's preference); *id.* at 55-56 (similar arguments based on single emails). Plaintiffs' effort to connect this material to class members' terminations (AOB 59-61) also fails; there is no evidence that "[t]he

jobs at issue in the emails could have been filled with benched non-Indian employees." AOB 60; *see also* 1-SER-8 (noting failure of Plaintiffs' overall theory that TCS placed Indians in jobs they could have filled); 2-SER-(294-296) (TCS hired externally only after exhaustive internal search).

In sum, these seven email strings did not tend to make *a corporate intent to terminate non-Indians or non-South Asians* any more or less probable.

But even assuming these emails had any relevance to Plaintiffs' termination claims, as they argue, it was well within the district court's discretion to exclude hiring evidence from this trial. Relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusion or undue delay. AOB 63 (citing Fed. R. Evid. 403); *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (discretion under Rule 403 is especially broad).

As explained, the court's *in limine* ruling addressed scores of exhibits and potentially extensive testimony about TCS's external hiring—as to which the court had already ruled Plaintiffs lacked

"sufficient proof that TCS 'operated under a general policy of discrimination'." 1-SER-39. Facing a lengthy and potentially multi-phase trial even if it kept the focus on terminations, the court properly curtailed the detour posed by external hiring evidence. And even if Plaintiffs had tested the admissibility of just these seven email strings at trial, they cite nothing to suggest these emails were anything but outliers—a miniscule fraction of hiring-related communications during the class period, in which a handful of employees seeking to hire "desis" may have violated TCS's *anti-discrimination* policy. That is the essence of undue prejudice.

### E. The Verdict Would Likely Have Been The Same Even If These Seven Email Strings Had Been Admitted.

Relying on *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014), Plaintiffs say "this Court begins with a presumption of prejudice" from any error in the emails' exclusion, which TCS must "overcome by showing that the jury would have more probably than not reached the same verdict even if the evidence had not been excluded." AOB 47. But that was dicta in *Barabin*. 740 F.3d at 464-465 and n.5 (appellees admitted they could not have won

without the disputed expert testimony); *see also* AOB 66 (citing *U.S. v. Carpenter*, 923 F.3d 1172 (9th Cir. 2019) [presumption cited, but overcome by "mountain of evidence" against appellant]).

No such presumption properly survives *Shinseki v. Sanders*, 556 U.S. 396 (2009), in which the Supreme Court repeated its "warn[ing] against courts' determining whether an error is harmless through the use of mandatory presumptions." *Id.* at 407. "The federal 'harmless-error' statute, now codified at 28 U.S.C. § 2111, … express[es] a congressional preference for determining 'harmless error' without the use of presumptions insofar as those presumptions may lead courts to find an error harmful, when, in fact, in the particular case before the court, it is not." 556 U.S. at 407-408.

Many decisions of this Court have correctly placed the burden of showing prejudice on appellants: "A party seeking reversal for evidentiary error must show that the error was prejudicial, and that the verdict was 'more probably than not' affected as a result." *Boyd v. City and Cty. of San Francisco*, 576 F.3d 938, 943 (9th Cir. 2009); *see also Ludwig v. Astrue*, 681 F.3d 1047, 1054 (2012) (lengthy discussion, quoting *Shinseki*); *Crowley*, 883 F.3d at 752 (quoting

*Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 859 (9th Cir. 2014)).

But TCS can easily carry any shifted burden to show the jury would have more probably than not reached the same verdict, had Plaintiffs actually offered these emails at trial and got them admitted. First, as shown above, the probative value of these seven email strings was negligible. Second, Plaintiffs were not "foreclosed from responding" to sporadic commentary on hiring at trial (AOB 67-68); they simply failed to object to it (*see id.*). Indeed the court allowed them to adduce some hiring evidence. *See, e.g.*, 2-SER-(113-121); *compare* 3-ER-(502-503) [Plaintiffs' Ex. 1208] *with* 3-ER-(519-520) [TCS Ex. 3404]). And third, TCS presented a "mountain of evidence" (*see Carpenter*, 923 F.3d at 1183) demonstrating its company-wide commitment to diversity and non-discrimination, long-term investment in growing the U.S. pipeline of qualified workers, and powerful financial incentive to assign every qualified and willing employee to customer needs. The jury would not likely have been swayed by these seven email strings to conclude TCS discriminated in terminations.

# CONCLUSION

The jury had the job of deciding whether Plaintiffs' statistics meant what they claimed: that TCS intentionally discriminated against the termination class. The jury did that job, at a trial without prejudicial error. This Court should affirm the judgment in favor of Tata Consultancy Services Limited.

Date: May 20, 2020

**LOEB & LOEB**
  Michelle M. LaMar
  Terrence D. Garnett
  Erin M. Smith

**GREINES, MARTIN, STEIN & RICHLAND LLP**
  Laurie J. Hepler
  Geoffrey B. Kehlmann

By  */s/ Laurie J. Hepler*
       Laurie J. Hepler

Attorneys for Defendant and Appellee
**TATA CONSULTANCY SERVICES, LTD.**

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,984 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced typeface.

Date: May 20, 2020      **GREINES, MARTIN, STEIN & RICHLAND LLP**

By  */s/ Laurie J. Hepler*
      Laurie J. Hepler

Attorneys for Defendant and Appellee
**TATA CONSULTANCY SERVICES, LTD.**

# STATEMENT OF RELATED CASES

Appellee knows of no related cases pending in this Court.

Date: May 20, 2020          **GREINES, MARTIN, STEIN
& RICHLAND LLP**


By   */s/ Laurie J. Hepler*
      Laurie J. Hepler

Attorneys for Defendant and Appellee
**TATA CONSULTANCY SERVICES, LTD.**